**STATE of Missouri, Appellant,**

v.

**Janice M. BURNETT, Respondent.**

**No. WD 67439.**

Missouri Court of Appeals, Western District.

July 17, 2007.

Kathleen Andrews Fisher, Asst. Prosecuting Atty., St. Joseph, for appellant.

Christopher Patrick Belts, St. Joseph, for respondent.

Before PAUL M. SPINDEN, P.J., PATRICIA A. BRECKENRIDGE, and JAMES M. SMART, JR., JJ.

JAMES M. SMART, JR., Judge.

This is an interlocutory appeal based on a motion to suppress that the motion court granted. The State contends that the motion court erred in granting the motion to suppress, because there were exigent circumstances that existed to justify the warrantless entry of the defendant's home. Finding error in the motion court's ruling, we reverse.

## Background

The relevant facts are not in dispute. On January 24, 2006, at approximately 1:11 p.m., Jennifer Capps at the Division of Family Services received a phone call concerning the well being of a certain infant, L.N., who was approximately twenty months old. According to the caller, the child's permanent guardian, her paternal grandmother Phyllis Wineinger, had been hospitalized and was unsure who was caring for the child. Wineinger became the legal guardian for L.N. after the parental rights of L.N.'s biological parents, Janice Burnett and Daniel N., were terminated. L.N. tested positive for marijuana upon birth as a result of Burnett's drug use during her pregnancy with the child. Burnett also consumed alcohol while she was pregnant. Daniel N.'s parental rights had been terminated because of a substantiated report of sexual abuse of a child and his history with law enforcement, which included illegal drug activity.

Following the call, Capps contacted the social worker at the hospital where Wineinger was staying to see if she could ascertain who might be caring for the infant. The social worker understood that the infant might be in the care of David and Carrie Ballard, the child's great uncle and aunt. At approximately 2:45 p.m., Capps contacted the Ballards to see if they were caring for L.N. The Ballards informed Capps that Daniel N., the infant's natural father, whose rights had been terminated, had come to their residence and picked up L.N. approximately fifteen to twenty minutes earlier.

Capps then contacted the hospital and was able to speak to Wineinger. Wineinger told Capps she thought, in view of the foregoing information, that the child would be at the home of Burnett, the infant's mother. At 5:15 p.m., Capps went to Burnett's home. She knocked on the door for several minutes; no one answered the door, although she could hear somebody inside. It appeared that her presence was known, but no one responded to the door. Capps then responded to another emergency situation with another family. Capps contacted the St. Joseph Police Department at approximately 7:05 p.m. to do a well-being check of L.N.

Officer Frank Till of the St. Joseph Police Department was dispatched to Burnett's home at approximately 7:23 p.m. to assist the Division of Family Services with the well-being check of L.N. Officer Till arrived at the residence at approximately 7:30 p.m. and met with Capps. Capps explained to Officer Till why they were looking for L.N. and that L.N. was possibly in the possession of her biological parents, whose parental rights had been terminated. She also stated why she believed this created a concern for L.N.'s welfare.

Officer Till and Capps knocked on the door several times; no one would answer the door, although Officer Till thought he heard movement in the home. Capps then left the home. Officer Till circled the block in his patrol car and then parked on the street west of the home. The windows of the residence were covered by a closed drape. At that time, he saw a shadow of a person holding what appeared to be a baby

or a small child in their arms. This confirmed that there was an infant in the house and that there were people in the house who chose not to respond to the door. Officer Till radioed for another unit to come to the home.

The home had an outer screen door and an inner door. Officer Till opened the outer screen door and began knocking on the inner door. As he knocked, the door came open about two inches. Another inner door kept the contents of the residence hidden from Officer Till's view. Officer Till continued to knock on the first inner door and yelled for someone to come to the door. A child, who appeared to Officer Till to be between the ages of ten and twelve, answered the door. The child told Officer Till that he had no right to open the door, that he should not be there, and that he should leave. Officer Till asked the child where his parents were, and the child responded that he did not know, but that they were not home. Without consent, Officer Till proceeded to enter the home to check the well being of L.N.

At the Motion to Suppress hearing, the trial court ruled that Officer Till illegally entered the home. The trial court found that exigent circumstances did not exist and that Officer Till should have obtained a warrant before entering the home. The trial court suppressed any testimony of Officer Till regarding what he saw after entering the home and any evidence seized by police after the illegal entry.

## Standard of Review

■ Our review of the trial court's decision on a motion to suppress is limited to a determination of whether there was substantial evidence to support the decision. *State v. Cromer*, 186 S.W.3d 333, 341 (Mo. App.2005). To the extent there is any dispute about the facts, all facts and reasonable inferences are viewed in the light most favorable to the trial court's decision,

and any contrary evidence or inferences are disregarded. *Id.; State v. Mahsman*, 157 S.W.3d 245, 248 (Mo.App.2004). However, where there is little or no dispute as to the facts of a case, such as this one, the question of whether or not the Fourth Amendment was violated is a question of law, which we review *de novo*. *State v. Simmons*, 158 S.W.3d 901, 907 (Mo.App. 2005).

## Analysis

■ The State contends that the trial court erred in sustaining the motion to suppress because the warrantless entry was permissible based on exigent circumstances. Specifically, the State contends that the well being of the child, L.N., and other children in the house was at stake. The State correctly points out that it is widely recognized that police are not barred from making warrantless entries when there is a reasonable belief that a person within the home is in need of immediate aid. *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). This, they say, justified Officer Till's entry into the home.

The Fourth Amendment of the U.S. Constitution, made applicable to the states through the Fourteenth Amendment, guarantees citizens the right to be free from unreasonable searches and seizures. *Cromer*, 186 S.W.3d at 343. Missouri's constitutional protection against unreasonable searches and seizures is coextensive with the protection provided by the Fourth Amendment. *Id*. The analysis is the same under both the U.S. Constitution and the Missouri Constitution. *State v. Ricketts*, 981 S.W.2d 657, 660 (Mo.App.1998).

■ A warrantless entry into a person's home is presumptively unreasonable. *Mahsman*, 157 S.W.3d at 249. The State can overcome this presumption by demonstrating that the entry fell within one of the carefully defined set of exceptions,

such as the presence of exigent circumstances. *Cromer*, 186 S.W.3d at 343. The determination of whether exigent circumstances exist is made on a case-by-case basis. *Id.* at 344. In making this assessment, we look to the circumstances as they would have appeared to a prudent, cautious, and trained officer. *Id.* Exigent circumstances do exist if the time needed to obtain a warrant would endanger someone's life. *Id.*

The State contends that Officer Till had information from Capps that raised the suspicion that the child was in immediate need of aid. The State emphasizes that L.N. was last known to be with her father, whose parental rights had been terminated for drug offenses and a substantiated, though uncharged, claim of child sexual abuse. Officer Till saw the silhouette of a person holding an infant or a small child. The attempts of Officer Till and Ms. Capps to contact the occupants were ignored by the occupants of the house. Wineinger, the child's legal guardian, had surmised that L.N. would be at that residence. These were sufficient to support the reasonable inference that L.N. was within the residence.

Twice the occupants of the residence had refused to answer the door. When the officer was finally able to provoke the appearance of a child at the back door, the child's demeanor and responses were evasive and far from helpful, as though the child had been instructed as to what to say by an adult. Ordinarily, when one is confronted by a police officer trying to get in, one wants to know what the officer is looking for, or what he is concerned about. Here, the child expressed no curiosity about what the officer was looking for. The circumstances were indicative that the child had been coached. Further inquiry of the child would have yielded nothing. To have postponed the entry to allow time to obtain a warrant would have delayed recovery of the infant and created a risk that the infant could be harmed in the meantime.

Many cases which have found a justification for a warrantless entry or search have been based on evidence of distressing circumstances involving an immediate threat of harm. *See Mahsman*, 157 S.W.3d at 249 (officers went to defendant's home to locate him after he had entered a neighbor's home unannounced, waving a gun around, saying the world was coming to an end and wanting the power shut off; it was reasonable for the officers to believe that the defendant was inside and armed and dangerous to himself or others); *State v. Kimberley*, 103 S.W.3d 850, 857 (Mo.App. 2003) (suspect had threatened police with a shotgun and neighbors had reported bizarre behavior; someone located in the apartment was armed; and it was reasonable for the officers to fear that other residents were still inside and in need of help); *State v. Turner*, 716 S.W.2d 462, 465 (Mo.App.1986) (defendant had recently shot one of his children, and neighbors informed officers that defendant's daughter had been living with defendant and was currently unaccounted for; officers were reasonable in believing that an additional victim may have been in the house in need of aid). While there was no indication here that anyone was firing firearms or threatening to do so, there were substantial and immediate concerns of danger arising out of the facts known to the officer.

In *State v. Epperson*, 571 S.W.2d 260 (Mo. banc 1978), and *State v. Orso*, 789 S.W.2d 177 (Mo.App.1990), substantial and immediate concerns of danger were found to justify a warrantless entry. In *Epperson*, the defendant's wife and children had been missing for several days, the defendant had given false and inconsistent explanations as to their whereabouts, an odor of death had been detected in his house, and the defendant had suddenly disap-

peared without explanation. 571 S.W.2d at 263. Moreover, because there were multiple people missing under unusual circumstances, and the odor in the house may have been indicative of barely surviving life, rather than death, the police were justified in breaking into the defendant's residence to see if there were people in need of medical aid. *Id.* at 264.

In *Orso,* the defendant's grandmother had been missing for several days. She had failed to keep regular visits with friends or respond to phone calls, her meals service had been inexplicably cancelled, she had not seen her physician or been admitted to any hospitals, and she was elderly and had a heart condition. 789 S.W.2d at 184. This was sufficient to support a conclusion that she could be in need of immediate medical aid, justifying the warrantless entry into her home. *Id.* The case before us bears similarities to *Epperson* (where there were many unanswered questions about where the family was, and an alarming odor of death or barely surviving life). Here, there were unanswered questions about the whereabouts of the infant, and yet the appearance that the infant was in the house, being kept hidden. There are also similarities to *Orso,* most noticeably that the helplessness of L.N., an infant of only twenty months, is similar to the helpless state of the aged grandmother in *Orso.* In each case, authorities were having trouble locating the vulnerable and helpless subject of the search.

■ When a young child is at risk from an individual with a history of violent or abusive behavior, exigent circumstances exist which may justify a warrantless search. *State v. Colon,* 272 Conn. 106, 864 A.2d 666, 698 (2004) (a warrantless search was appropriate under the emergency exception when there was a young child in a residence with an abusive adult because she was "less able than an adult to protect herself from further harm"); *State v. Boggess,* 115 Wis.2d 443, 340 N.W.2d 516, 524–25 (1983) (the presence of young children with an allegedly abusive adult, who had a reputed bad temper, fit the emergency exception because of the relative vulnerability of the children). In *State v. Johnston,* the Missouri Supreme Court held that an officer's warrantless "sweep" of a residence that had been the site of a recent, fatal incident of domestic violence fit the emergency exception, because a young child living there had not yet been accounted for. 957 S.W.2d 734, 744 (Mo. banc 1997).

At the motion to suppress hearing, Burnett relied on *State v. Simmons,* 158 S.W.3d 901 (Mo.App.2005), for the proposition that the entry was illegal. In *Simmons,* the officer was dispatched to a building to check on the well being of a person, but could remember nothing more about the directive. The officer was not even sure of the identity of the person who was supposed to be in need of the check. *Id.* at 904. Upon arriving, the officer found no one around the building, but did find the front door shattered and the east end garage door partially opened. *Id.* The court concluded that these facts alone were insufficient to support a warrantless entry into the building. *Id.* at 908. The court found it significant that nothing about the dispatch message indicated that someone was in need of emergency medical assistance. Also, no evidence was presented as to whether the superficial damage appeared to be recent or was otherwise indicative of a crime in progress that would justify an immediate entry. *Id.* at 907.

This case differs from *Simmons.* L.N. had been picked up by her biological father, whose parental rights had been terminated for drug abuse and apparent child abuse. The facts indicated that L.N. was likely in the home. The officer had observed a window presenting a silhouette of

a person holding an infant. Third, a child who appeared to be ten to twelve years old informed the officer that his parents were not home; would not say where they were; and was attempting to be evasive, as though the child had been coached by an adult. The child expressed no curiosity as to why the officer was there. The child confronted the officer with the statement that the officer was not entitled to be there, and wanted the officer to leave immediately. It was reasonable for the officer to disbelieve the boy and to believe some mischief might be occurring that would affect the welfare of the infant.

It is an important function of the state and law enforcement to secure the well being of helpless children who are being hidden or closeted by those who lack authority to keep the child from properly constituted officers of the state, particularly when a child is at the mercy of an individual with a history of sexual abuse of children and drug abuse. While we recognize that the state's interest in the protection of children must be balanced against the constitutionally mandated privacy interest one has against impermissible state intrusion into her home, we believe the factors in this case could reasonably be viewed as tilting the scale in favor of immediate entry. In view of the highly suspicious circumstances in question, we disagree with the trial court's conclusion that there were no exigent circumstances justifying the warrantless entry.

### Conclusion

For all of the foregoing reasons, the judgment is reversed and the case is remanded for further proceedings.

SPINDEN and BRECKENRIDGE, JJ., concur.